UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CAIXA GERAL DE DEPOSITOS, S.A., | : | |
| CGD USA HOLDING COMPANY, INC., | : | |
| Plaintiffs, Counter-Defendants, | : | CIVIL ACTION NO. 03-746 (MLC) |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| JACINTO RODRIGUES, | : | |
| JOAQUINA RODRIGUES, | : | |
| Defendants, Counter-Claimants, Third-Party Plaintiffs, | : | |
| CROWN BANK, N.A., | : | |
| Defendant, Counter-Claimant, | : | |
| JOSEPH B. GREER, | : | |
| JOSE MARIO GOMES, | : | |
| Defendants, | : | |
| v. | : | |
| MANUEL J.M. FIGUEIRA, FRANCISCO N. GRACA, DALE PRUSINOWSKI, ALBERTO SOARES, CARLOS CASTRO, LUIS NETO, MIGUEL MARQUES, ANTONIO TOMAS CORREIA, BARRY GALLOGLY, | : | |
| Third-Party Defendants. | : | |

This matter comes before the Court on four separate motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) and one motion to dismiss pursuant to Rule 12(b)(6).  These include:

(1) a motion for summary judgment on the defamation and injurious falsehood claims of defendants / third-party plaintiffs Jacinto Rodrigues and Joaquina Rodrigues, filed by Caixa Geral De Depositos, S.A. ("Caixa"), Manuel J.M. Figueira, Francisco N. Graca, Alberto Soares, Luis Neto, Miguel Marques, and Antonio Tomas Correia (referred to collectively with regard to this motion as the "defamation defendants");

(2) a motion to dismiss or, in the alternative, for summary judgment on third-party plaintiffs' fiduciary-duty and prima-facie-tort claims, filed by Caixa, Figueira, Graca, Soares, Neto, Marques, and Correia (referred to collectively with regard to this motion as the "moving third-party defendants");

(3) a motion for summary judgment on all claims, filed by Jacinto Rodrigues ("Rodrigues"), Joaquina Rodrigues (with Jacinto Rodrigues, referred to collectively as the "Rodrigues family"), Joseph B. Greer, and Jose Mario Gomes (all four referred to collectively as the "moving defendants");

(4) a motion for summary judgment as to the relief of rescission and reformation, filed by the moving defendants; and

(5) a motion to dismiss filed by Gomes and Greer.

Also before the Court are appeals from three orders of the Magistrate Judge, filed by Caixa, CGD USA Holding Company, Inc., Carlos Castro, Barry Gallogly, Dale Prusinowski, Soares, Correia, Figueira, Graca, Marques, and Neto.  For the reasons stated in this memorandum opinion, we will: (1) grant the defamation defendants' motion for summary judgment on defendants' / third-party plaintiffs' defamation and injurious falsehood claims, (2) deny the remaining motions for summary judgment, (3) deny in part and grant in part the motion to dismiss, and (4) affirm two orders of the Magistrate Judge and set aside part of one order.

<u>**BACKGROUND**</u>

**I.   <u>Undisputed Facts</u>**

The parties agree on the following facts which, unless stated otherwise, are taken from the Final Pretrial Order.

Plaintiff Caixa is a Portugese commercial bank.  Plaintiff CGD USA Holding Company, Inc. ("CGD USA") is a bank holding company approved by the Board of Governors of the Federal Reserve System.  CGD USA is a Delaware corporation and has its principal place of business in New York.  Defendant Crown Bank, N.A. ("Crown") is a National Banking Association chartered by the

Office of the Comptroller of the Currency ("OCC").  Crown has its principal place of business in Brick Township, New Jersey. Defendant / third-party plaintiff Jacinto Rodrigues is a shareholder, director, and executive vice president of CGD USA, and is chairman of Crown's board of directors.  Defendant / third-party plaintiff Joaquina Rodrigues, the wife of Jacinto Rodrigues, is a shareholder of CGD USA, a director of CGD USA, and a director of Crown.

Defendant Joseph B. Greer is a director and the president and chief executive officer of Crown.  Defendant Jose Mario Gomes is a director of Crown.  Third-party defendant Manuel J.M. Figueira, a citizen of Portugal and resident of South Africa, is a director of CGD USA and Crown.  Third-party defendant Francisco N. Graca, a citizen and resident of the United States and Portugal, is a director of Crown.

The parties executed a series of interrelated documents (the "Agreements"), including:

- an Agreement and Plan of Reorganization, between Crown, CGD USA, Rodrigues, and Caixa ("Agreement and Plan of Reorganization")

- a Shareholders Agreement, between Caixa, CGD USA, and Jacinto and Joaquina Rodrigues ("Shareholders Agreement")

- a three-year Business Plan, incorporated in the Shareholders Agreement ("Business Plan")

- a Subscription Agreement between CGD USA, Caixa, and Jacinto and Joaquina Rodrigues

- a Warrant Exchange and Cancellation Agreement between Rodrigues, Crown, and CGD USA

- a Common Stock Purchase Warrant between CGD USA and Rodrigues

- an Employment Agreement between Crown and Rodrigues

- a Non-Competition Agreement between Crown, CGD USA, and Rodrigues

- a Stock Option Assumption Agreement between CGD USA and Rodrigues

- a Stock Option Assumption Agreement between CGD USA and Joaquina Rodrigues

- a Loan Facility Agreement between Caixa and Rodrigues.

Crown shareholders approved the transaction at a special meeting on November 19, 2001.

The parties negotiated extensions to the Agreements on each occasion that the Agreements expired.  These negotiations included adjustments to the price per share of Crown to reflect Crown's performance and consequential adjustments to the contributions of Caixa and Jacinto and Joaquina Rodrigues to consummate the transaction.  The OCC advised, on October 21, 2002, that it would approve the transaction.  The closing, accordingly, was scheduled for the next day.

II.  **Disputed Facts**

A.   **Facts Alleged by Caixa and CGD USA**

The following facts are alleged in the Second Amended Complaint, unless noted otherwise.  We focus here on the facts most salient to our analysis of the motions.

Caixa is a commercial bank wholly owned by the government of Portugal.  Caixa entered into negotiations with Crown in the spring of 2001.  Caixa's objective was to acquire a controlling interest in Crown as a means of both establishing a commercial banking presence in the United States that would appeal to Portuguese-speaking communities, and enhancing its worldwide network of financial service companies.  The Rodrigues family owned 42.8% of Crown when Caixa began negotiations with Crown.

CGD USA was formed on August 13, 2001, as the holding company through which Caixa would invest in Crown.  The parties executed various documents on October 2, 2001, that set forth the following: Caixa would contribute $20 million for which it would receive a 51% interest in CGD USA, while the Rodrigues family would contribute both $7.5 million and 49% of the stock of Crown for which they would receive a 49% interest in CGD USA.  As a result of the transaction, CGD USA would become the sole shareholder of Crown, with Caixa becoming the indirect majority shareholder of Crown by virtue of its 51% stake in CGD USA.

The Agreements granted Rodrigues a "put," by which Rodrigues would hold the right, for three years after the closing, to require CGD USA to purchase his shares at a price based on a multiple of the book value of Crown.  The multiple would range from 1.5 to 2.0 depending on the time of exercise.  The Agreements also granted Caixa a "call," by which it could purchase the Rodrigues family's shares at a higher price than Rodrigues's "put."  (1-7-05 Tr. at 46-48.)

The Shareholders Agreement, _inter_ _alia_, addressed the selection of directors for CGD USA and Crown for the three years following the closing.  The board of CGD USA would consist of five directors – three appointed by Caixa and two appointed by Rodrigues.  The Crown board would consist of seven directors – four appointed by Caixa and three appointed by Rodrigues.  For the three years following the closing, Caixa would be required to utilize one of its appointments to the Crown board by appointing Rodrigues as a director.  The effect of this requirement, claim the plaintiffs, was that "while [Caixa would have] overall control of the entity as the indirect majority shareholder of Crown, the Rodrigues family [would have] voting 'control' of the Crown Board for three years."  (Sec. Am. Compl., ¶ 19.)

Caixa and CGD USA claim they "would never have entered into the Agreements, including but not limited to the put and the designation of [Rodrigues] as a Caixa-designated director in the

7

Shareholders Agreement, had there been any reason to expect that Rodrigues and his designated Crown directors would not permit and would actively prevent Crown's integration into Caixa."   (Id., ¶ 20.)

Plaintiffs claim that the relationship between Caixa and the Rodrigues family was intended to be a joint venture partnership, as made explicit by the Business Plan.  Plaintiffs assert that "[i]t was the parties' clear understanding that Caixa would have an active role in the day-to-day operations of the bank, and in the integration of Crown into Caixa."  (Id., ¶ 22.) Specifically, plaintiffs claim that

> it was expected that Caixa's Mr. Manuel Figueira, as Vice-Chairman of Crown and as Caixa's representative on Crown's Executive Committee, would be significantly involved, on a day-to-day basis, in implementing the parties' Business Plan, and in modernizing the Crown image so as to be identified with the Caixa group.
> . . .
> It had also been understood, since as early as May 2002, that Caixa would have one representative on the three-member Executive Committee of the Crown Board.  Such representation on the Executive Committee is essential to the integration of Crown into the Caixa international banking network and also to enable plaintiffs to meet their reporting and monitoring obligations to [] regulators [in the United States and Portugal].

(Id., ¶¶ 22 - 24.)

The closing took place on October 22, 2002.  As of that date, Caixa's contribution to CGD USA had been increased from $20 million to $23.6 million while the Rodrigues family's

8

contribution had been reduced from $7.5 million to $6 million,
which was funded by Caixa's lending Rodrigues $7.5 million on
favorable terms.

At the closing, plaintiffs claim, the Rodrigues defendants
"were supposed to sign . . . a Resolution of the new Crown Board
that, among other things, confirmed Caixa's agreed-upon minority
participation on Crown's Executive Committee." (Id., ¶ 28.)
Plaintiffs allege that

> Rodrigues expressed his preference for dealing with that
> part of the transaction at the first regular meeting of
> Crown's new Board, scheduled to take place three days
> thereafter . . . . Trusting that this step was simply a
> formality, Caixa proceeded to close the transaction.
>
> In fact, [Rodrigues's] secret intention at the time was to
> vote against and cause the other Rodrigues directors to vote
> against the Executive Committee Resolution and otherwise to
> deny Caixa any meaningful participation in the day-to-day
> implementation of the Business Plan.
>
> Given that the parties were entering into a joint venture
> relationship with attendant fiduciary obligations, Rodrigues
> had a duty, prior to closing, to disclose his true
> intentions concerning Caixa's participation in the Executive
> Committee and the integration of Crown into Caixa.
>
> Had Caixa known there would be any question concerning such
> participation, it would never have closed the transaction.
>
> At the first meeting of the new Crown Board held three days
> thereafter . . . Rodrigues made known for the first time his
> true intention to exclude Caixa representatives from day-to-
> day oversight of the bank in general and from Executive
> Committee participation in particular.  The Executive
> Committee Resolution, which was an integral part of the set
> of closing documents, was replaced by a new Resolution with
> the name of Mr. Figueira deleted.  When the Caixa directors

objected, Rodrigues peremptorily announced that his forces
controlled the Board . . . .  A motion to form a three-
member Executive Committee composed entirely of Rodrigues
directors was thereupon made and passed, with the Rodrigues
directors voting for it, and the Caixa directors voting
against it.  The Caixa directors thereupon walked out of the
meeting.

(Id., ¶¶ 28-32.)  The Crown Board, following the departure of the
Caixa directors, inter alia, formed an Audit Committee composed
of Rodrigues directors.

The Crown Board met on November 7, 2002 – a meeting that was
attended by Rodrigues-appointed directors but not by Caixa-
appointed directors.  At this meeting, Rodrigues "stated in
substance that Caixa Geral had no authority to direct Crown
Bank's management."  (Sec. Am. Ans., ¶ 35.)  Viewing the
situation as a "crisis" or a "house divided," CGD USA noticed on
January 9, 2003, a special meeting of the CGD USA Board to be
held on January 21 to consider resolutions adopting amendments to
the Crown Articles of Association and Bylaws.  (Sec. Am. Compl.,
¶ 36.)  One such amendment would add the following language to
the Crown Articles: "The shareholders of the association shall
have the sole power to amend, alter or repeal the bylaws at any
meeting of the shareholders."  (Id. at ¶ 37.)  Other amendments
would address the formation and composition of the executive
committee and the audit committee.

Rodrigues, shortly after CGD USA's notice, on January 13
called a special meeting of the Crown Board for January 15, 2003.

At that meeting, the Crown Board – again with only the four
Rodrigues-appointed directors in attendance – amended the Bylaws
"to require that any attempt by CGD USA, as sole shareholder of
Crown, to amend Crown's Bylaws must first be approved by the
Crown Board." (Id. at ¶ 41.)  CGD USA, in turn, adopted its
resolution amending Crown's Articles of Association and Bylaws at
its January 21 meeting.

Plaintiffs claim that "[b]ased on defendant Jacinto
Rodrigues' willful and persistent refusal to work with Caixa in
its effort to achieve the objectives of their joint venture
partnership, and to cooperate with both Caixa and CGD USA to
fulfill their reporting responsibilities to the regulators, Caixa
has reluctantly concluded that the relationship is no longer
tenable." (Id. at ¶ 49.)

## B.    Facts Alleged by the Rodrigues Family

The Rodrigues family does not dispute all of the plaintiffs'
alleged facts as to the negotiation and execution of the
Agreements.  However, the Rodrigues family in the Counterclaim
does dispute several key facts regarding the Agreements.

The Rodrigues family alleges that the Shareholders Agreement
provides the Rodrigues family with the ability to control the
Crown Board insofar as its provisions allow them to fill four of
the Board's seven seats.  The Rodrigues family claims that, in
negotiating the Shareholders Agreement, Caixa understood that the

Rodrigues family would be entitled to majority control of the
Crown Board for as long as the Rodrigues family retained a 49%
interest in CGD USA.  (Countercl., ¶¶ 4-5.)  The Rodrigues family
further asserts that

> The Shareholders' Agreement makes no provision for the
> appointment of any particular persons to membership of any
> of the various committees of Crown Bank.

> The selection of individuals to serve on the various
> committees of Crown Bank is left to the discretion and
> business judgment of the Board of Directors of Crown Bank.

> Neither the Shareholders' Agreement nor any other document
> provides that Caixa Geral must be afforded an opportunity to
> participate actively in the day-to-day operations of Crown
> Bank or to place representatives on any of the committees of
> Crown Bank.

> Caixa Geral understood and agreed, in connection with the
> execution and implementation of the Shareholders' Agreement,
> that the Rodrigueses and the existing Crown Bank management
> would continue to retain oversight of the day-to-day
> operations of Crown Bank after acquisition by Caixa Geral of
> its 51% indirect interest.

(Countercl., ¶¶ 6-9.)

The Rodrigues family claims that the Crown Board, after the
closing on October 22, 2002, appointed the members of various
committees in its discretion and business judgment.  Such
appointments, claims the Rodrigues family, were made in
accordance with the Crown Bylaws.  Caixa objected to these
appointments "because the Board of Directors did not appoint any
representatives of Caixa Geral to the Executive Committee."  (<u>Id.</u>
at ¶ 13.)  As a result, the Rodrigues family claims,

[b]ecause of its displeasure over not having any of its representatives appointed to the Crown Bank Executive Committee, Caixa Geral has undertaken a deliberate and collusive effort to stunt the anticipated growth and prosperity of Crown Bank, to harm the reputation of Jacinto Rodrigues, to diminish the value of the Rodrigueses' [CGD USA] stock holdings, and to minimize the price at which Caixa Geral will purchase the [Rodrigueses' CGD USA] stock when either the call or the put rights set [forth] in the Shareholders' Agreement are exercised.

(Id. at ¶ 14.)

## DISCUSSION

### I.   Motions for Summary Judgment

#### A.   Standard of Review for Summary Judgment

A court may grant a motion for summary judgment

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).  Once the summary judgment movant has met this prima facie burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial" and "may not rest upon the mere allegations or denials of the adverse party's pleading."  Id. at (e).

A court must view the evidence in the light most favorable to the nonmovant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the

13

matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). This standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248.

We find that genuine issues of material fact preclude our granting summary judgment on all claims except those for defamation and injurious falsehood.

**B.   Plaintiffs' and Defendants' Opposing Motions for Summary Judgment**

Plaintiffs and third-party defendants (collectively referred to as "plaintiffs" for purposes of this motion) move for summary judgment on the Rodrigues family's fiduciary duty and prima facie tort claims. Defendants – the Rodrigues family, Gomes, and Greer – move for summary judgment on all of plaintiffs' claims. We will consider these motions simultaneously because they are in large part based on the same set of disputed facts. These motions center around the issue of what duties the parties owed each other under the Agreements into which they entered. (See 3d Party Pl. Br. Supp. Summ. J. at 37-41; Pl. Br. Opp. Summ. J. at 18-21.)

Delaware law governs questions of construction and performance under the Shareholders Agreement.  (Final Pretr. Ord. at 38.)  However, federal and New Jersey law control on questions of Crown's governance and the right to amend its charter and bylaws.  (Id.)

Plaintiffs' fiduciary duty claims are based on their assertion that the parties entered into a joint venture. There is no fixed definition of "joint venture" in Delaware law, e.g., a statutory definition, but we consider several elements in determining the existence of a joint venture, including:

> (1) a community of interest in the performance of a common purpose;
> (2) joint control or right of control;
> (3) a joint proprietary interest in the subject matter;
> (4) a right to share in the profits;
> (5) a duty to share in the losses which may be sustained.

Wah Chang Smelting & Ref. Co. v. Clev. Tungsten Inc., No. 1324-K, 1996 WL 487941, at *3-*4 (Del. Ch. Aug. 19, 1996).  We also consider whether the parties intended to enter into a joint venture.  See In re Coffee Assocs., No. 12950, 1993 WL 512505, at *5 (Del. Ch. Dec. 3, 1993) ("An essential element of a joint venture is an agreement, express or implied, evidencing the

parties' intent to engage in a business enterprise of that
kind.")[1]

The parties dispute the element most fundamental to the
existence of a joint venture relationship, _i.e._, whether there
existed a community of interest in the performance of a common
purpose.  Plaintiffs claim that the parties intended to form a
joint venture partnership and argue, _inter alia_, that the
Business Plan annexed to the Shareholders Agreement makes
explicit the existence of a joint venture relationship.  The
Business Plan, for example, refers to the structure of the
reorganized Crown as a "joint venture partnership."  The Business
Plan and Shareholders Agreement, argue the plaintiffs, reflect
the attributes of a joint venture: "Beyond the parties'
respective monetary contributions to CGD USA and the obvious
intent to share profits and losses, the Business Plan reflects
throughout an intention for the parties to work together, to be
identified with one another, and to take advantage of
'synergies.'" (Pl. Br. Opp. Summ. J. at 19-20.)  Defendants,
however, argue that no joint venture exists.  Defendants argue,

---

[1]   _See also_ _Wah Chang_, 1996 WL 487941, at *5-*6 (noting
requirement that "parties must demonstrate 'something more' than
co-ownership" to prove the existence of a joint venture, and
describing the "something more" as a showing of intent: "[F]or
the Court to find that [the parties'] relationship was that of
joint venturers, the facts must show that they intended to do
more than simply make independent investments in [the alleged
joint venture].").

inter alia, that the reference to a "joint venture partnership"
in the Business Plan was made early in the discussions between
Caixa and Crown, before the parties agreed to establish CGD USA
as "a separate corporation through which to hold their respective
ownership interests in Crown."  (3d Party Pl. Br. Supp. Summ. J.
at 38.)

     We find that the determination of whether the parties
entered into a joint venture, with attendant fiduciary duties, is
inappropriate by summary judgment because issues of material
fact, such as the parties' intent, are in dispute.  See In re
Coffee Assocs., 1993 WL 512505, at *5 ("Whether or not a joint
venture relationship was intended is essentially a factual
determination.").  We therefore will deny plaintiffs' request for
summary judgment as to defendants' fiduciary duty claims and will
deny defendants' request for summary judgment as to plaintiffs'
fiduciary duty claims and their claim for termination of the
joint venture.

     Material issues of fact also prevent us from deciding by
summary judgment the plaintiffs' claims based on the Agreements
themselves, i.e., their claims of fraud, breach of contract,
breach of the covenant of good faith and fair dealing, and claims
for declaratory relief, as well as defendants' claims of prima
facie tort.  The key factual dispute here is whether the parties

had an agreement that Caixa would have representation on the executive committee by virtue of appointing one of its members.

Section 1.3(a) of the Shareholders Agreement states, in relevant part:

> [CGD USA] shall cause Crown Bank to take all necessary and appropriate corporate action, including, if appropriate, the amendment of the bylaws of Crown Bank, to provide . . . (ii) for the appointment of an executive committee of the Crown Board, which shall consist of three (3) members.  The executive committee shall be charged with overseeing the implementation of the Business Plan . . . as it relates to Crown Bank, on a day-to-day basis.

(Shareholders Agmt., § 1.3(a), Duckstein Cert., Ex. O.) Plaintiffs argue that the Shareholders Agreement does not fully reflect the parties' longstanding understanding that Caixa would have the power to appoint a member to the executive committee. (Pl. Br. Opp. Summ. J. at 27-31.)  They allege that this understanding was expressed by the parties, among other places, at a January 31, 2002 meeting attended by Rodrigues and two Caixa representatives, Manuel Figueira and Duarte Cabral.  (Id.; id. at 10.)  Plaintiffs assert that Caixa's representation on the executive committee was an essential element of the parties' agreement, without which the transaction would not have closed. (See, e.g., id. at 31.)  Defendants, on the other hand, argue that the Shareholders Agreement fully represents the agreement between the parties.  (See e.g. Def. Br. Supp. Summ. J. at 18-19.)  Any understanding as to executive committee representation that is not expressed explicitly in the Shareholders Agreement,

they argue, does not modify the language of § 1.3(a) because (1) not all signatories to the Shareholders Agreement agreed to the alleged modification, (2) such an agreement by Rodrigues would be invalid as an encroachment upon his fiduciary duties as a Crown director, and (3) such an oral modification is not allowed under the Shareholders Agreement.  (Id. at 18-34.)

     We find again that issues of fact preclude our granting summary judgment in defendants' favor on plaintiffs' claims. Defendants move on the basis that the alleged modification fails for any of the reasons stated supra, but plaintiffs argue that the alleged oral agreement was not a modification of the Shareholders Agreement.  Rather, they claim, the oral agreement to allow for Caixa representation on the executive committee was a crucial element of the parties' contract as the plaintiffs and the defendants understood it.  In support of this argument the plaintiffs point to such issues of fact as: (1) the extent to which the parties contemplated Caixa representation on the executive committee during negotiations; (2) the feasability of implementing the Business Plan without Caixa representation on the executive committee; (3) whether an agreement was reached as to Caixa representation on the executive committee at the January 31, 2002 meeting; and, (4) whether a proposed consent document, including a resolution for the formation of an executive committee to be composed of Rodrigues, Greer, and Caixa's

appointee Figueira was intended to be part of the parties'
agreement.  (Pl. Br. Opp. Summ. J. at 27-29.)  Such factual
issues prevent our granting summary judgment on plaintiffs'
claims in defendants' favor.

### C.   Remedies of Rescission and Reformation

Defendants request summary judgment in their favor on
plaintiffs' demand for rescission or reformation of the
Agreements.  Because the Court has discretion in fashioning
equitable remedies such as rescission and reformation based on
the facts of each case, and because we find that issues of fact
would make an order limiting our ability to fashion such a remedy
premature at this stage in the litigation, we will deny
defendants' motion.

> Rescission and reformation are equitable remedies designed
>
> to restore the parties to the status quo ante and prevent
> the party who is responsible for the [wrongdoing] from
> gaining a benefit.  To qualify for the equitable relief
> sought, the party must show special circumstances justifying
> a departure from the generally controlling principle that
> parties are bound by the contracts they make for themselves.
> Ordinarily, contracts may only be rescinded [or reformed]
> where there is original invalidity, fraud . . . or a
> material breach.  [E]ven where the grounds for rescission
> [or reformation] exist, the remedy is discretionary and will
> not be granted . . . where there has been substantial
> performance.  [Although] not an absolute requirement, the
> court must be able to return the parties to their original
> position.  A plaintiff seeking rescission or reformation
> must prove by clear and convincing evidence [the] right to
> the equitable remedy.

Farris v. County of Camden, 61 F.Supp.2d 307, 336 (D.N.J. 1999)

(citations and quotations omitted).

20

Defendants move to strike these equitable remedies on the bases that: (1) the Agreements which plaintiffs would have rescinded or reformed have been substantially performed; (2) it would be unfair to return plaintiffs to the status quo ante without also returning defendants to the same; (3) Crown will suffer if Caixa's capital is withdrawn; and (4) plaintiffs have an adequate remedy at law, i.e. money damages, that precludes an equitable remedy.  (Def. Br. at 16-19.)

We find that defendants' motion is premature.  As noted supra, the status of the Agreements is an issue of fact that we will not decide by summary judgment.  Whether there has been substantial performance necessarily must follow a prior determination of the obligations that arise out of the Agreements.  Defendants are correct that a finding of substantial performance could exclude the remedies of rescission and reformation, but that determination cannot be made at this stage of the litigation.  See Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc., 913 F.Supp. 837, 843-44 (D.N.J. 1995) ("[T]he remedies of rescission and reformation are discretionary and . . . where there has been substantial performance, these remedies

are not available.").[2]  We will, therefore, deny the motion

without prejudice to renew at the appropriate time.

    As for defendants' remaining arguments about the

appropriateness of these equitable remedies, we note the Court's

broad discretion in fashioning a remedy appropriate to the facts

of this case.  We advise that in the event we are called upon to

do so, we will fashion a remedy with an eye toward the equities

involved on both sides of the transaction.

    **D.   Claims of Defamation and Injurious Falsehood**

    The Rodrigues family asserts claims of defamation and

injurious falsehood against the defamation defendants.

(Countercl., ¶¶ 55-72; 3d Party Compl., ¶¶ 32-39.)  The

defamation defendants request summary judgment on these claims.

    The defamation and injurious falsehood claims are based on

two letters sent to federal regulators by Caixa's counsel.  (3d

Party Pl. Br. at 1; Defam. Def. Br. at 1.)  The Rodrigues family

alleges that Caixa's counsel, Justine Clark, sent letters to the

OCC on December 8, 2002 ("OCC letter"), and to both the OCC and

_____

    [2]  See also Koch Materials Co. v. Shore Slurry Seal, Inc.,
No. 01-2059, 2005 WL 147061, at *5 (D.N.J. Jan. 13, 2005)
(finding that under Kansas law, which as New Jersey law holds
that rescission is unavailable when there has been substantial
performance, the court could not determine at the summary
judgment stage whether rescission would be an appropriate remedy
because whether there had been substantial performance or
material breach remained an unresolved issue of fact: "the Court
will not determine, in advance of a potential jury finding,
whether the alleged breach is material, warranting rescission").

the Federal Reserve Bank of New York ("Federal Reserve") on December 12, 2002 ("Federal Reserve letter").  (3d Party Pl. Br. at 2.)  The OCC letter, <u>inter alia</u>, accused Rodrigues of twelve classes of violation of OCC regulations, while the Federal Reserve letter said that Crown's balance sheets did not meet generally accepted accounting principles ("GAAP") or prudent auditing standards and called for an independent audit of Crown. (<u>Id.</u>)

Defamation defendants argue they cannot be held liable for these communications since the letters are protected by the <u>Noerr -Pennington</u> doctrine.  The <u>Noerr-Pennington</u> doctrine provides immunity from suit for petitions for redress directed to governmental entities.  <u>See</u> <u>E. R.R. Pres. Conf. v. Noerr Motor Freight</u>, 365 U.S. 127 (1961); <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657 (1965).  Originally developed around antitrust issues, <u>Noerr-Pennington</u> applies to state tort claims as well.  <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119, 128-129 (3d Cir. 1999).

<u>Noerr-Pennington</u> immunity does not apply, however, to petitions or lawsuits that are a "sham."  <u>Cheminor</u>, 168 F.3d at 122.  A petition is a sham if it is "objectively baseless." <u>Prof'l Real Est. Investors v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 60 (1993) ("<u>PRE</u>").  However, "the existence of probable cause to institute legal proceedings precludes a finding that

[the petitioner or litigant] has engaged in sham litigation."
Cheminor, 168 F.3d at 122.  A showing of probable cause for
bringing the petition, which is an absolute defense to claims
based on the petition, "requires no more than a reasonable belief
that there is a chance that a claim may be held valid upon
adjudication."  Id.  The probable cause inquiry is a two-step
test.  First, the petition "must be objectively baseless in the
sense that no reasonable litigant could realistically expect
success on the merits.  If an objective litigant could conclude
that the suit is reasonably calculated to elicit a favorable
outcome, the suit is immunized under Noerr, and [a] claim
premised on the sham exception must fail."  Id. at 122-23.  We
reach the second step, i.e. the petitioner's subjective
motivation in bringing the petition, only if we find that the
petition was objectively baseless.  Id. at 122-23 & n.10.

    The Rodrigues family does not dispute that the letters at
issue are correctly characterized as the petitioning of a
governmental entity for redress such that Noerr-Pennington
immunity may be available.  (See 3d Party Pl. Br.)  Rather, the
Rodrigues family argues that the letters fall into the "sham"
exception.  (Id. at 5-7.)  The Rodrigues family further argues
that issues of material fact exist as to whether the accusations
in the letters were objectively baseless, and that the defamation

24

defendants have failed to produce evidence to support application of <u>Noerr-Pennington</u> immunity.   (<u>Id.</u>)

But the Rodrigues family's argument misstates the burden involved in the <u>Noerr-Pennington</u> inquiry.   The burden falls on the Rodrigues family to prove that the letters were objectively baseless, and not on the defamation defendants to prove otherwise.   The two-step probable cause inquiry, described <u>supra</u>, "requires the plaintiff to disprove the challenged lawsuit's <u>legal</u> viability before the court will entertain evidence of the suit's <u>economic</u> viability.   Of course, even a plaintiff who defeats the defendant's claim to <u>Noerr</u> immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation."   <u>PRE</u>, 508 U.S. at 61 (emphasis in original).   The Rodrigues family must prove both the objective and subjective components of a sham in order to pierce defamation defendants' claim of <u>Noerr-Pennington</u> immunity.

We must determine whether defamation defendants had probable cause to send the letters, and in making that determination, we must be satisfied that the letters were not objectively baseless. <u>Cheminor</u>, 168 F.3d at 123.   To have an objective basis to send the letters to the OCC and the Federal Reserve, defamation defendants must have had a reasonable belief that Crown was in violation of the various federal banking laws, regulations, OCC

guidelines, GAAP, and prudent auditing standards that Clark cited in her letters. (See id.).

We are satisfied that Clark's letters exhibit such a reasonable belief on the part of defamation defendants. The OCC letter, inter alia, includes a table that lists specific federal banking laws, regulations, and OCC guidelines and the reasons why Caixa believed Crown to be in violation of same. (OCC Letter, Wapner Cert., Ex. A.) Clark advises that her letter is based on a review of Crown's records obtained in the course of Caixa's due diligence regarding the Agreements, as well as on information otherwise available to Caixa. (Id.) Similarly, the Federal Reserve letter describes in detail the reasons why Caixa believed Crown to be acting in disregard of GAAP and prudent auditing standards. (Federal Reserve Letter, Wapner Cert., Ex. C.)

The Rodrigues family acknowledges that Clark based her conclusions on a review of "Crown's entire loan portfolio during the due diligence period before closing," yet argues that the motion should be dismissed because defamation defendants have not produced the evidence that formed the basis of Clark's conclusions. (3d Party Pl. Br. at 8-10.) We have already noted that it is the burden of the Rodrigues family, and not the defamation defendants, to prove that the letters were objectively baseless. The Rodrigues family points to Clark's deposition testimony to show that she could not recall specific allegedly

26

problematic loans and that her conclusions were based on hearsay. (Id.)  These arguments, even if we accept the few accompanying factual assertions as true, fall far short of the Rodrigues family's burden of proving that the letters were objectively baseless.  Because the Rodrigues family has failed to meet the first step of the two-step inquiry, we do not reach the inquiry into defamation defendants' subjective motivation in sending the letters.  We find that these letters are protected by Noerr-Pennington immunity and therefore we will grant defamation defendants' motion for summary judgment on the Rodrigues family's claims of defamation and injurious falsehood.

## II.  Appeals of Magistrate Judge's Orders

### A.  Standard of Review

A Magistrate Judge is accorded wide discretion in addressing non-dispositive motions.  Miller v. Beneficial Mgmt. Corp., 844 F.Supp. 990, 997 (D.N.J. 1993).  The Court may not reverse, modify, or vacate a Magistrate Judge's order addressing a non-dispositive motion unless that order is "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a); Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113, 1120 (3d Cir. 1986).  This is so even if we would have decided the issue differently.  Toth v. Alice Pearl, Inc., 158 F.R.D. 47, 50 (D.N.J. 1994).  "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been committed." Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) (quotations and citation omitted). A Magistrate Judge's determination is contrary to law if the Magistrate Judge misinterpreted or misapplied the applicable law. Gunter v. Ridgewood Energy Corp., 32 F.Supp.2d 162, 164 (D.N.J. 1998). "The party filing the notice of appeal bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law." Cardona v. Gen. Motors Corp., 942 F.Supp. 968, 971 (D.N.J. 1996).

Caixa, CGD USA, Castro, Gallogly, Prusinowski, Soares, Correia, Figueira, Graca, Marques, and Neto (referred to collectively as "plaintiffs" in regard to these three motions) appeal from three orders of the Magistrate Judge: (1) the order of October 19, 2004 that denied plaintiffs' request to amend the pretrial scheduling order to allow for further discovery ("the Discovery Order"); (2) the order of October 19, 2004 that denied plaintiffs' request to file a third amended complaint ("the Pleading Order"); and (3) the order of December 22, 2004 that denied plaintiffs' request to supplement the final pretrial order ("the December 22 Order").

**B.   Discovery Order**

Plaintiffs appeal the Discovery Order that prevented them from taking "follow-up" discovery based on the deposition of Bonnie Schulz, Crown's former Compliance Officer.  (Pl. Br. at 1-10.)  Plaintiffs argue that while the Magistrate Judge "correctly referenced that the relevant legal inquiry was whether [plaintiffs] had acted diligently, [the Magistrate Judge] ultimately overlooked [plaintiffs'] demonstrated diligence and focused instead on the fact that the request was made when this litigation was 'poised for final resolution.'" (Id. at 11-12.)

We find that plaintiffs fail to show that the Magistrate Judge's decision was "clearly erroneous or contrary to law." Cardona, 942 F.Supp. at 971.  The Magistrate Judge, in finding that plaintiffs failed to show the good cause required to amend the discovery deadlines, (1) considered plaintiffs' diligence, and (2) noted the defendants' argument that plaintiffs' claim that they pursued this discovery with diligence was contradicted by plaintiffs' election "not to pursue the discovery through document demands or even call for the deposition of Ms. [Schulz] until the very end of fact discovery." (Disc. Ord. at 3-5.)  In the alternative, the Magistrate Judge found that plaintiffs had ample opportunity to conduct discovery during fact discovery and before the final pretrial conference, pursuant to Rule 26(b)(2)(ii).  (Id. at 4-5.)  Given our deference to the

29

Magistrate Judge's management of pretrial proceedings, and based on plaintiffs' failure to show that the Magistrate Judge's order was clearly erroneous, we will affirm the Discovery Order.

### C.   Pleading Order

Plaintiffs appeal from so much of the Pleading Order which denied their request to file a third amended complaint asserting damages claims against defendant Greer.[3]  (Pl. Br. at 1.) Defendants argue that (1) the new allegations in the proposed-third amended complaint arise from events known to plaintiffs before they filed the original complaint, and (2) allowing the amendment will require further discovery and will prejudice defendants.  (Def. Br. at 9-11.)

Rule 15(a) provides that a plaintiff may amend a complaint upon "leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  "[A] district court has the discretion to deny this request if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000).

---

[3]   While the Pleading Order denied plaintiffs' request to add a claim against defendants Greer, Gomes, and Joaquina Rodrigues, they appeal only as to their proposed claim against Greer.  (See Not. Appeal at 2; Pl. Br. at 1.)

The Magistrate Judge based the Pleading Order on,
inter alia, findings that fact discovery had closed and that
allowing the amendment would require the reopening of discovery.
We note, however, that Greer is a named defendant in the second
amended complaint for alleged breach of fiduciary duties, as he
was in the original complaint. (Sec. Am. Compl., Count 6;
Compl., Count 1.) We note also that the final pretrial order
anticipates a damages claim against Greer. (Final Pretr. Ord. at
17 ("The facts on which plaintiffs rely to recover punitive
damages from defendant Greer include his complicity in concealing
from Caixa, prior to closing, knowledge of the Schulz federal
criminal investigation concerning Crown and its attendant risks
to Crown, and to his role in Crown's misapplication of CGD USA's
funds after closing.").) Plaintiffs assert that no further
discovery will be needed in furtherance of this claim. (Pl. Br.
at 1 ("Expanding the relief sought to include damages claims
should require no additional discovery on liability. . . . And it
should require no additional discovery on damages.").) To the
extent that the Magistrate Judge's decision was based on the
possibility of further discovery, we will set aside the Pleading
Order and allow plaintiffs to amend their claim against Greer
without allowing further discovery on this issue, i.e., on
Greer's liability or damages. We find that allowing such an
amendment will not prejudice Greer because (1) no further

discovery will be conducted and (2) he has been a named defendant in this case since the complaint was filed.

### D.   December 22 Order

Plaintiffs appeal the December 22 Order, which denied their request to supplement the final pretrial order with four documents and one factual contention regarding conduct by the executive committee.  (Pl. Br. at 1.)

Rule 16(e) states that a final pretrial order "shall be modified only to prevent manifest injustice."  In determining whether a proposed modification would result in manifest injustice, the Court may consider several factors: "(1) prejudice or surprise in fact to the nonmoving party; (2) ability of that party to cure the prejudice; (3) extent to which waiver of the rule would disrupt the orderly and efficient trial of the case; (4) bad faith or willfulness on the part of the movant." Scopia Mortg. Corp. v. Greentree Mortg. Co., 184 F.R.D. 526, 528 (D.N.J. 1998).  In denying plaintiffs' request to amend the final pretrial order with the requested documents and factual contention, the Magistrate Judge considered such factors and found that the proposed amendment would result in prejudice or surprise in fact of the nonmoving party.  (Dec. 22 Ord. at 3.) Specifically, mindful of the potential disruption to the trial schedule, the Magistrate Judge found that prejudice would arise because "adding the amendments at this late stage of the

32

litigation process would certainly require the reopening of discovery to include the probing of internal management decisions." (Id.)  We find that plaintiffs have failed to show that this finding was clearly erroneous, and therefore we will affirm the December 22 Order.

## III. **Motion to Dismiss**

### A.    Standard of Review

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).  On a motion to dismiss we must accept as true all of the factual allegations in the complaint, and must draw all reasonable inferences in favor of the plaintiffs. Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  "Dismissal of claims under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim upon which relief may be granted." Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D. Pa. 2002).

### B.    Motion by Gomes and Greer

Defendants Gomes and Greer move to dismiss the second amended complaint as asserted against them for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  Gomes and Greer so move based on the assertion that, while they are named defendants, plaintiffs have not made a claim

33

"seeking any affirmative relief against them in their individual [capacities]." (Def. Br. Supp. Mot. Dismiss at 7-8.) We have held that we will grant plaintiffs leave to amend the second amended complaint as against Greer. The motion to dismiss as to Greer, therefore, will be moot when plaintiffs file a third amended complaint alleging damages against him. In view of our ruling that such pleading may now be filed against Greer, we will deny his motion to dismiss. Because plaintiffs do not appeal that part of the Pleadings Order which denied their request to amend the second amended complaint as against Gomes, and because the second amended complaint does not seek damages from Gomes, we will grant the motion to dismiss as to Gomes.

## CONCLUSION

The Court, for the reasons stated, will grant the motion by the defamation defendants for summary judgment in their favor. We will deny the following motions: (1) plaintiffs' motion for summary judgment on fiduciary duty and prima facie tort claims, (2) defendants' motion for summary judgment on all claims, (3) defendants' motion for summary judgment as to rescission and reformation.  We will grant the motion to dismiss as to Gomes and deny the motion to dismiss as to Greer.  We will affirm the Discovery Order and the December 22 Order of the Magistrate Judge, and will set aside so much of the Pleading Order as denied plaintiffs' request to amend the second amended complaint as to Greer.  An appropriate order and judgment will follow.


  s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge